STATE, EX REL. ELLA MAY NELSON, APPELLEE, V. LINCOLN MEDICAL COLLEGE ET AL., APPELLANTS.*

FILED APRIL 23, 1908.·  No. 15,031.

1. **Mandamus: MEDICAL COLLEGES: GRADUATION.** A corporation ·organized under section 15, ch. 16, Comp. St. 1905, is a private eleemosynary institution, and the duty cast by law upon its directors to graduate students who have complied with the regulations of said institution and taken its required course of study is a statutory duty to such an extent as to give the courts jurisdiction in a proper case to compel by mandamus the exercise of that function.

2. **Medical Colleges: BOARD OF DIRECTORS: RECOMMENDATION OF DEAN OF FACULTY.** Under the by-laws of the respondent corporation, the dean of the faculty of the college has the right, and it is his duty, to pass upon the standing of students applying for graduation, and his report to the board that a student has complied with the regulations of the college, and that said scholar has passed in all studies a grade entitling her to graduation, is equivalent to a recommendation of the faculty to the board of directors.

3. **Mandamus: MEDICAL COLLEGES:· ISSUANCE OF DIPLOMA.** When the dean has reported to the directors that a student has fulfilled all demands of the institution, and has passed all examinations so as to entitle her to a diploma, and the board of directors arbitrarily and capriciously refuses to graduate the student and issue her diploma, it is the duty of the district court, upon proof of said facts, to issue a writ of mandamus to compel the college corporation and its directors to discharge their said duty.

4. **Evidence in this case examined, and found to be sufficient to sustain the action of the district court.**

* Rehearing denied.  See opinion, p. 545, *post.*

APPEAL from the district court for Lancaster county: EDWARD P. HOLMES, JUDGE. *Affirmed.*

*Strode & Strode* and *Tibbets & Anderson,* for appellants.

*Charles O. Whedon* and *J. A. Brown, contra.*

ROOT, C.

Lincoln Medical College is a corporation organized under section 15 *et seq.,* ch. 16, Comp. St. 1905. Its purpose is to prepare students for the practice of medicine and surgery, and it is affiliated with Cotner University. Its course of study is four years, and it maintains a faculty of nineteen members. The articles of incorporation provide for nine directors, and that the officers shall be a president, secretary and treasurer to be chosen by the directors. The articles also state: "The board of directors shall establish such by-laws as they deem necessary for the governing of the business of the corporation, and shall have the power to prescribe the powers and duties of any officer of the corporation." The by-laws provide that a stockholder must be a duly elected member of the faculty and in active work in the regular course of instruction, and that upon severing his relation with the faculty the stockholder shall return his stock to the corporation upon certain terms. The by-laws further provide for an executive board consisting of the president, secretary and treasurer, and that this board shall exercise all power of the board of directors, subject to a confirmation of its acts at the next regular monthly meeting thereof. It is further provided in section 3, art. 8 of the by-laws: "The dean shall have general supervision over the members of the faculty, the methods of teaching and the discipline of the school. He shall have the power to call the faculty together, and at all such meetings he shall be the presiding officer. He shall pass on the standing of all students at the time of graduation, and also upon all applicants for advanced standing." Prior to

June 7, 1906, the board of directors of the college consisted of but five members, and during the period covered by the inquiry herein the respondents Metheny, Ramey and Wilmeth constituted the executive board. Dr. Keys of Omaha was dean of the school.

The relator is a married woman, and in 1902 matriculated as a student at said college, and from thence continued in the various classes till commencement in 1906, when she insists she had completed the course prescribed for students in said college, and was entitled to be graduated and receive her diploma. The executive board determined on June 3, 1906, she had not passed with the required grades in some studies, notably those presided over by respondents Wilmeth, Ramey and Metheny, and that she, with three other students, including her husband, who also studied during the period she was a student at said school, should be "plucked." The five directors met June 5, whereupon, in a discussion over the unfortunate students, Dr. Carriker and Dr. Keys, the latter being the dean, suggested those students were qualified and should graduate. There is some difference as to just what was done at that meeting. Dr. Ramey and Dr. Metheny testified that they offered to produce the examination papers of the students, and to argue the matter with the board, whereas Dr. Wilmeth insisted no one other than himself was competent to mark the answers to his questions. Upon taking a vote, four present voted to ratify the act of the executive board, and one, Dr. Carriker, voted against the proposition. The dean says he voted aye, so he would be in a position to move a reconsideration. Later relator requested that her papers be returned to her, so she might know her grading, but this was refused. The faculty was not called together, nor did the dean pass on the standing of the "plucked" students, except as he insisted in a general way that they were worthy and should be graduated. The directors had made a rule that in final examinations students must answer an average of 80 per cent. of all questions

propounded to them in the aggregate of the examinations, and not fall below 70 per cent. in any one subj. et.

This action was brought in mandamus to the district court against the corporation and Ramey, Metheny and Wilmeth, praying that the individual respondents be compelled to deliver to the relator her examination papers in order that it might be ascertained whether she had properly passed her examinations, and, if the court should find it necessary, to submit said papers to experts for examination, and if on such examination and report it should be found she had passed her examinations, and was entitled to be graduated, that respondent corporation by its proper officers be required to issue to relator a diploma according to the practice in cases where students are graduated from said respondent. It was claimed by relator that she had taken the necessary work and had answered correctly 80 per cent. of the questions propounded to her on final examinations. The corporation claimed in its return to the writ that relator had not paid her graduation fee, nor pursued a four years' course of study; that she had been conditioned in various studies; that she had failed to pass in the subjects taught by at least four of the instructors, and that the board in the exercise of its discretionary powers had refused to graduate her. The individual respondents, in addition, in their return claim they were without power to graduate relator until directed by a vote of the board of directors. A lengthy and patient hearing was given all parties by the learned trial judge, who held the respondents had acted arbitrarily and without authority in deciding relator was not entitled to graduate, and that said question should be determined by the dean, Dr. Keys, and directed him to forthwith pass upon relator's application for graduation and determine her rights in that respect, and to report his findings to the board of directors and to the court; that, if he reported in favor of the relator's graduation, the respondent corporation forthwith execute and deliver to relator her diploma certifying that she had

graduated from said institution. This order was made June 5, 1906. Respondents, evidently anticipating the order of the court, on the 31st of May, 1906, called a special meeting of the stockholders of the corporation for June 7, and at said time elected respondent Wilmeth dean of the college, elected a board of directors of nine members, and submitted to Wilmeth relator's claim that she was entitled to be graduated. Whereupon Wilmeth found relator had not pursued a four years' course at the college; that she had been conditioned in her studies, and had failed to pass a grade of 70 in eight subjects on her final examinations, and recommended to the directors that she should not be graduated.

At that time Keys was still dean. He had tendered to Cotner University his resignation as dean of the medical school to take effect later than June 7, but this resignation had not been accepted, and had been recalled before Wilmeth's election. In conformity with the court's order Dean Keys on June 6 passed on relator's qualifications for graduation, and found she was entitled to graduate. Dean Keys made report to the court, and respondents filed supplemental answers, setting up their proceedings and the actions of Dr. Wilmeth while acting as dean. The court refused to pass on the regularity of Wilmeth's election, but found that Dr. Keys had been dean during all the time relator had been a student in respondent college, and was peculiarly fitted to pass on her qualifications; that the order of the court was directed to Dean Keys, and his action was conclusive, and thereupon granted a peremptory writ commanding the college and its proper officers to issue a diploma to relator.

1. It is insisted the record affirmatively discloses that relator did not attend the medical school, nor qualify therein, as required to entitle her to a diploma, and reference is made to the announcement of the college that the student must have attended four full courses of medical lectures, no two in any one year, completed three full courses in practical anatomy under direction of the

demonstrator, dissected every part of the human body, successfully passed the final examinations, answering 80 per cent. of all questions propounded, oral and written, and pay all fees before she could be graduated; that the standing of each student will be determined by the professor or instructor in charge of the chair and the grade made upon marks received during the session in oral quizzes, written quizzes and final term examinations. It is claimed relator was absent from her classes from the middle of January, in her sophomore year, to the close of that year; that she failed to pass her examinations under Drs. Gray, Jester, Howard, Andrus, Spradling, Ramey, Metheny and Wilmeth; and that she has not paid all her fees.

The record discloses that the relator gave birth to a child during her attendance at college, and of necessity was absent a short time from all classes; that occasionally she would miss a lecture, but her attendance was much more sustained and continuous than other students. It was shown upon the trial that the football squad would not report till after Thanksgiving; that students were graduated who attended but two years; that one student was absent during one year 54 per cent. of the time, another 40 per cent., others 50 per cent. Concerning the general scholarship, students had been passed who did not take all final examinations, some had not taken intermediate examinations of various studies, and in some instances the board had marked up the grades from 40 reported to 75 so as to bring the students over the required passing grade to entitle them to graduate under the rules. While there is some question about the scholarship of relator in branches taught by Jester, Howard and Spradling, much is cleared up, and the rock she encountered was the respondents Metheny, Ramey and Wilmeth. Those gentlemen refused to permit relator or her attorney to inspect her papers, and refused to produce them in court until ordered to do so by the trial judge. It is claimed there was an unwritten law that a student should not

receive back his papers, but if he failed to grade would receive that information, and if he did grade would be given the percentage. The rule was observed by most of the professors, but not by all of them. Dr. Wilmeth destroyed his papers some time after they were submitted to him, or at least they were disposed of in some manner, and therefore were not produced. There is one remarkable feature of his report to the executive board as to the standing of the four "plucked" students, and that is each one is given a grade of 68 per cent., just 2 per cent. below passing, a remarkable coincidence. Ramey and Metheny produced their papers after an order by the trial court, and they had given relator 57 per cent. and 47 per cent. respectively. Physicians were called by relator and respondents, respectively, and with practical unanimity testified according to the sides for which they were subpœnaed that the markings were far too low or just about correct. If one would believe the eminent professional gentlemen who testified for relator concerning the papers presented by Metheny and Ramey, she should have been credited thereon with 77 to 90 per cent. Dean Keys testified that on Metheny's examination she was entitled to a credit of 84 per cent., and on Ramey's of 77 per cent. Dr. Robinson testified relator was entitled to 94 per cent. on the Metheny papers. Dr. Somers, an eminent practitioner of Omaha, and a member of the state medical board, testified that he had examined relator's examination papers in Dr. Ramey's department, and that she was not entitled to a grade of over $56\frac{1}{2}$ per cent. thereon. One cannot read the record without concluding, as did the trial judge, that a court could not well fix from the conflicting testimony the grade earned by relator in taking the examination before Drs. Ramey and Metheny, nor can one well escape the conviction that the action of respondents was arbitrary and capricious. Respondents dominated the school as absolutely as ever Cæsar did his empire. They constituted the executive board, and a majority of the board of directors, as constituted be-

fore June 7, 1906. Neither the statutes nor the by-laws of the corporation bound those gentlemen in their conduct.

The board of the college, under section 17, ch. 16, Comp. St. 1905, had "power to confer, on the recommendation of the faculty, all such degrees and honors as are conferred by colleges and universities of the United States, and such others, having reference to the course of study and the accomplishment of the student, as they may deem proper"; that is, the board could grant degrees upon the recommendation of the faculty. Yet Dr. Metheny admits the faculty had never met as a body; that never in the history of the college had the faculty been convened to consider a student's qualifications to graduate. Dr. Ramey objected to the members of the faculty coming to the executive board to influence their decision; said that, when they (executive board) made up their minds not to pass a student, the scholar should not be passed. Dr. Metheny says, referring to graduating scholars: "Yes, sir; we claim the right to do that, because it was business in the hands of the executive committee." He further said the members of the faculty were not given a vote on graduating a student. All the respondents claimed that each professor had the autocratic right to fix the grade on his examinations, and that no one had the right to interfere therewith. If respondents are right, a student may pay the college fees, all expense, and devote his entire energies for four years of study in respondent college, and, if upon final examination he should incur the ill will of one professor, that man could prevent the student from graduating or receiving his degree, and, if he had passed successfully every examination with a grade of 100 in each study, still this executive committee of three could preclude a graduation. This is neither the law of the land nor of the institution. Respondents, with all their intellect and determination, while acting as directors, are but creatures of the corporation, exercising, delegated power which finds its

source in the laws of Nebraska and the articles of incor-
poration and by-laws of respondent college. The statute
authorizes the selection of a board of not less than five,
nor to exceed nine, directors, who have power to adopt
by-laws and rules for the government of the artificial
person. The articles of incorporation authorize the di-
rectors to adopt by-laws "for the governing of the bus-
iness of the corporation," and that the directors should
have full power to prescribe the powers and duties of the'
officers of the corporation. Acting under this grant of
power, the board of directors in the by-laws created the
office of dean, and gave the incumbent thereof the power
to call the faculty together, and "he shall pass on the
standing of all students at the time of graduation." Pre-
sumably the dean would be a man of superior attain-
ments; probably more generally learned than the occu-
pant of any chair in the college, and a man of broad
views, of judicial temperament, to whom finally all ques-
tions of moment should be submitted for decision. The
dean would not come in contact with students in those
branches of learning taught by most of the professors
He would not be colored with that prejudice that some-
times instinctively and without any well-known reason
is created between some individuals, so that, should any
professor so far forget himself and his high calling as
to unjustly discredit a student's work, the dean with
propriety could pass upon that scholar's standing. The
faculty of respondent has never as a body exercised this
function of recommendation. Each member thereof has
sent in his report, and action by the dean has been taken
thereon. In making a recommendation for graduation
the members of the faculty do not exercise a corporate
function, and there is nothing in the statute to prevent
the adoption of a reasonable and orderly method of col-
lecting the opinions of the professors, and, if necessary,
of having those opinions reviewed by some competent
and superior member, so that the recommendations may
be crystalized into a recommendation upon which it will

be the duty of the board of directors, in the name of the college, to act.

2. It is said mandamus is not the proper remedy; that relator has her action in damages or for a specific performance of her contract, and that the court cannot by said writ control the exercise of a discretion vested in the board of directors. We held in *Moores v. State*, 71 Neb. 522, that the application for a writ of mandamus is addressed to the sound judicial discretion of the court; that after its issue, it is only in a clear case of abuse of discretion that the granting of the writ will be reversed. Did the trial court abuse its discretion in issuing the writ? Defendant is a private corporation of an eleemosynary character. *Regents of University v. Williams*, 9 Gill & Johns. (Md.) 365, 31 Am. Dec. 72; *Board of Education v. Bakewell*, 122 Ill. 339. To encourage the dissemination of learning, individuals are permitted to incorporate under section 15, ch. 16, Comp. St. 1905. That corporation is authorized to receive and retain donations of property, and its assets are exempt from taxation. The directors, upon recommendation of the faculty, are clothed with power to issue diplomas and grant degrees to the students, and, when they do so, they exercise a corporate power and perform a duty cast upon them by statute. The fact that the statute is not mandatory in its terms will not excuse the board from performing its duty to relator. *People v. Board of Supervisors*, 51 N. Y. 401. Mandamus will lie. Merrill, Mandamus, secs. 157, 158. In *State v. School District*, 31 Neb. 552, we issued a peremptory writ of mandamus, after hearing, to compel the reinstatement of a pupil improperly excluded from the public schools. In *Jackson v. State*, 57 Neb. 183, we issued the writ commanding those in control of the state normal school at Peru to admit a student to said school. *Vermillion v. State*, 78 Neb. 107. In *State v. Milwaukee Medical College*, 128 Wis. 7, the court refused to issue the writ to compel the Milwaukee Medical College to make out and

deliver to relator his diploma of graduation from said
school.   Mr. Justice Kerwin says: "The case made is
clearly one of breach of contract, and the question arises
whether mandamus will lie to compel a private corpo-
ration to perform its contract." The conclusion in that
case was that the relator had ample remedy in an action
for damages or for the specific performance of his con-
tract. We do not take the view of the Wisconsin court,
and refuse to accept its judgment as precedent. We are
of opinion that there is enough of statutory duty on
the part of respondent to comply with relator's demand,
to invest the court with jurisdiction to issue the writ.   In
*Baltimore University v. Colton*, 98 Md. 623, 64 L. R. A.
108, a mandamus was issued to reinstate relator as a
student in the law department of the university.   Mr.
Justice Fowler stated in said case that an action for
damages was not an adequate remedy, nor would specific
performance lie, for the reason that mandamus was an
adequate legal remedy.   In *People v. Bellevue Hospital*,
60 Hun (N. Y.), 107, relator had completed his medical
course, but had been arbitrarily refused permission to
present himself for examination or to receive the degree
to which he was entitled.   The general term reversed an
order made at circuit denying the writ, and in the court
of appeals the order of the general term was affirmed.
128 N. Y. 621.   In *Keller v. Hewitt*, 109 Cal. 146, re
lator had applied for a grammar grade certificate en
titling her to teach in the public schools.   She took the
examination, and passed all branches according to the
rule established by the board, and was found to be a
person of good moral character, yet the board refused
her the certificate.   The board was compelled by writ
of mandamus to perform its plain duty.   In the instant
case the dean has settled relator's standing in respondent
college and her scholarship so far as her right to a di-
ploma is concerned, and, in refusing to do what the
statute in effect requires it to do, respondent is declin-

ing to perform one of the very functions for which it was created.

The action of respondents Wilmeth, Metheny and Ramey, acting in conjunction with the greater number of the stockholders, in selecting Wilmeth dean, after the interlocutory order directing Keys to pass upon relator's scholarship and examinations, is a plain attempt to evade the process and judgment of the court, and emphasizes the bias and prejudice of respondents toward relator, and their contempt for law and its enforcement. However, Keys had acted under the court's order and passed on relator's standing one day before the special election, and before the action of Wilmeth whereby he sought to embalm and perpetuate the actions of himself and associates. The judgment of the district court was not affected by the special election of June 7 and the proceeding following therefrom.

Respondents have been active at every stage of these proceedings in contesting relator's allegation that she had passed the final examinations, and took advantage of the court's order that the dean pass upon her scholarship by procuring Metheny to report adversely to her, so that we need not consider any possible misjoinder or non-joinder of actions or parties at the commencement of this cause. Courts have maintained that a single writ would issue against all officers concerned in separate but co-operative steps taken in the attainment of one result. In *State v. Bailey*, 7 Ia. 390, a writ was approved that commanded election of officers to canvass a vote and to abstract and report it to the county judge, and to the last-named officer to file the report and declare the result. Merrill, Mandamus, sec. 235. We cannot consider the claim that relator's graduation fee has not been paid, because respondents refused to act for the sole alleged reason that relator had not passed her final examinations, and will not be permitted now to shift their ground. *State v. Board of County Commissioners*, 60 Neb. 566.

Upon the entire record, we are satisfied the learned

trial judge did not abuse, the sound judicial discretion of the court in issuing the peremptory writ of mandamus, and we therefore recommend that his judgment be affirmed.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.

The following opinion on motions for rehearing and to open up the case was filed November 6, 1908. *Motions overruled:*

PER CURIAM:

Two motions are on file in this case. One for a rehearing, and the other asking us to allow the respondent to open up the case, to appoint a referee, and take additional evidence in support of the defense interposed in the court below.

Treating of the second motion, we do not understand that any such practice as is here sought to be established ever has obtained in this court. It must be borne in mind that this action was commenced in the district court for Lancaster county, and was there tried and decided upon the evidence and under the issues there framed and presented for the consideration of that tribunal. The respondent, not being satisfied with the result of that trial, has brought the case here for review, and, while his appeal entitles him to a trial *de novo*, still such trial must be had upon the pleadings and the evidence presented to the district court and certified in the record brought here on appeal. This rule is well established, and is without doubt the correct practice. To allow new issues to be framed and additional evidence introduced in cases brought to this court for review would, in effect, destroy the strictly appellate character of the supreme court.

38

We are therefore of opinion that the second motion should be overruled. As to the motion for a rehearing, after examining the arguments we are of the opinion that our former judgment is right, and the motions are therefore

OVERRULED.